# IN THE COURT OF APPEALS OF IOWA

No. 21-0468
Filed December 15, 2021

**IN RE THE MARRIAGE OF MICHEAL LEHMAN
AND KRISTY LEHMAN**

**Upon the Petition of
MICHEAL LEHMAN,**
   Petitioner-Appellee,

**And Concerning
KRISTY LEHMAN n/k/a KRISTY ANN MANN,**
   Respondent-Appellant.

_____

Appeal from the Iowa District Court for Hamilton County, John R. Flynn,

Judge.

A mother appeals the modification of the physical care provision of a

dissolution decree. **AFFIRMED.**

Matthew G. Sease of Sease & Wadding, Des Moines, for appellant.

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

Divorced parents Kristy Mann and Micheal Lehman both sought physical care of their daughter A.J.L., who has "a significant mental health history." The district court placed A.J.L. in Micheal's physical care, finding that he could better handle her behavioral challenges. Kristy appeals, emphasizing her history as the primary caregiver. Despite that history, the record shows that living mainly with Micheal is in A.J.L.'s best interests. So we affirm the modification order. We also affirm the denial of trial attorney fees to Kristy. And we order both parties to pay their own appellate attorney fees.

## I. Facts and Prior Proceedings

A.J.L. was born in 2011. Her parents married in 2013 and divorced in 2016. In their divorce, they stipulated to joint legal custody and joint physical care. But several months after entry of the decree, Micheal moved to Eagle Grove for a new job as a police officer. Kristy and A.J.L. remained in Estherville, a two-and-a-half-hour drive away. After Micheal's move to Eagle Grove, the parents informally agreed A.J.L. would stay with Kristy during the week and alternate weekends with him. That schedule would reverse during the summer months.

When Kristy and Micheal separated in 2015, she had a brief relationship with another man, Justin, with whom she had a child in 2016. Kristy then met her current fiancé Josh. Before these proceedings, A.J.L. lived with Kristy, Josh, and her half-sister. Micheal married Kaitlin in 2018, and they have a fourteen-month-old son. In early 2019, Micheal took another new job, this time with the Webster City police department. Kristy and Josh also moved that year, relocating with A.J.L. to Graettinger.

Much of this appeal focuses on A.J.L.'s behavioral difficulties, especially surrounding transitions, which started when she was about three years old. The parents testified that her tantrums could last from a few minutes to hours. They would begin as general defiance and could escalate to hitting, kicking, and breaking things. At their worst, these incidents involved A.J.L. urinating, biting, and head-butting. The parties posited some causes for these outbursts. When she was five years old, A.J.L. was sexually abused for two months by Kristy's then-boyfriend Justin.[1] Beyond that abuse, A.J.L. generally struggled with her parents divorcing.

The parents sought mental-health services for their daughter. At her first evaluation at age six, psychologists offered several diagnoses including anxiety disorder, posttraumatic stress disorder, oppositional defiant disorder, speech sound disorder, and borderline intellectual functioning. The psychologists also diagnosed autism spectrum disorder, but other providers disagreed, including A.J.L.'s treating psychiatrist, Dr. Steven Cochran.

A.J.L. began seeing Dr. Cochran in early 2019.[2] Dr. Cochran added a diagnoses of ADHD. He prescribed medications and recommended Kristy use a restraint during A.J.L.'s most violent outbursts requiring Kristy to put A.J.L. face down on the floor and lie on top of her. Kristy reported using the restraint

---

[1] Kristy obtained a protective order against Justin. But because he disappeared shortly afterward, there was no ongoing department of human services (DHS) or criminal case addressing the sexual abuse.

[2] Although not present in person, Micheal attended the first appointment by phone.

periodically. But through 2019, Kristy noted gradual improvement with less frequent outbursts and less need for the restraint.[3]

In September, Kristy administered the restraint resulting in A.J.L. having some bruises and a rash on her cheek. School officials reported the injuries to the DHS.[4] DHS investigator Kelly McKeever advised Kristy to stop using the restraint. While working with the DHS, family consultant Mindy Dooley recommended Kristy take A.J.L. to the emergency room or call police when she could not control the girl's behaviors. Yet Dr. Cochran stood by his prescribed technique. He also recommended psychiatric inpatient treatment. Micheal did not agree A.J.L. needed that level of care. He preferred A.J.L. come live with him.

Just a month after the restraint investigation, the DHS began another child abuse assessment. This time, A.J.L.'s teachers noticed a bruise on her arm; Josh admitted causing it while restraining her. The DHS investigator determined the injury was accidental.

In January 2020, Dr. Cochran retired, and Dr. David Ermer took up A.J.L.'s treatment. In connection with adjusting her medications, Dr. Ermer recommended

---

[3] During his summer 2019 parenting time, Micheal informed Dr. Cochran that he was seeing more negative behaviors at his house than in the past. Then in July 2019, during one of A.J.L.'s tantrums, Micheal performed a restraint on A.J.L., putting his back against a wall and holding A.J.L. in his lap. Micheal testified he learned this technique as a youth counselor.

[4] Following an investigation, the DHS found the physical abuse allegation was confirmed. But Kristy appealed, citing Dr. Cochran's medical advice, and DHS reversed their finding to "not confirmed."

This was not the first DHS involvement with A.J.L. In 2016, DHS investigated Micheal for giving A.J.L. a bruise on her upper arm. Micheal first claimed A.J.L. fell on a hair brush. But later he admitted he was brushing her hair and hit her in "a moment of frustration." The DHS confirmed the allegation but did not place Micheal on the child abuse registry.

a brief inpatient admission to a behavioral health unit.  Micheal was frustrated with that decision.  A.J.L. also began seeing a therapist regularly.  Evidence conflicted over Micheal's participation in her therapy.  Kristy testified he rarely attended appointments.  Micheal testified Kristy gave short notice for what would be a several hour drive for him.  He otherwise participated by phone.  Micheal also arranged for a second opinion from a psychiatrist in Iowa City in August 2020.  That psychiatrist's recommendations largely aligned with what A.J.L. was already doing with her primary providers.

At her school, A.J.L. has an individualized education plan (IEP) and works with a special education teacher every day.  Her teacher Suzanne Koenck reported that although A.J.L. needs extra help at school, she has not had violent outbursts.  Her teachers have never had to perform a restraint or call police.

The parents' informal custody arrangement held for a time.  But in January 2020, Micheal petitioned for physical care.  Kristy answered seeking physical care for herself.  In its detailed and lengthy ruling, the court found two material and substantial changes in the circumstances since the decree.  First, the parties no longer lived close enough to make joint physical care work.  Second, A.J.L.'s mental-health issues had escalated and warranted a change.  And the court found Micheal demonstrated the ability to provide A.J.L. superior care because A.J.L. has less outbursts in his home.  Kristy appeals.

## II.  Scope and Standard of Review

We review child custody matters de novo.  *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020).  In doing so, we examine the whole record and decide the issues anew.  *Id.* at 5.  The district court's fact findings merit deference, but

they do not bind us. *In re Marriage of Heiar*, 954 N.W.2d 464, 469 (Iowa Ct. App. 2020). We give most weight to the district court's determinations of witness credibility. *Thorp*, 949 N.W.2d at 5.

## III. Discussion

### A. Physical Care

The primary issue is the modification of physical care. Usually, the petitioning party bears a "heavy burden" to show (1) a material and substantial change in circumstances and (2) that they can minister more effectively to the child's well-being. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). Here the change in circumstances is uncontested. So Kristy focuses on Micheal's "failure to prove a superior ability to minister to A.J.L.'s special needs." *See id.*

The parties debate whether Micheal's burden is to show "superior" or "better" care. Generally, once a physical care arrangement has been established, the parent seeking to modify it has a "heavy burden *and* must show the ability to offer superior care." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002) (emphasis added). But when parents have joint physical care, the court has found both to be suitable custodians. *Id.* So when one parent petitions to modify that arrangement and proves a material and substantial change in circumstances, we have said the parties stand on equal footing and bear the same burden to prove who can render "better" care. *In re Marriage of Kreager*, No. 10-0945, 2011 WL 1584293, at *2 (Iowa Ct. App. Apr. 27, 2011) (citing *Melchiori*, 644 N.W.2d at 369).

The district court also questioned the applicable test. Its ruling pointed to *In re Marriage of Harris*, which cited the *Frederici* standard requiring proof of "a superior ability to minister to the needs of the children." 877 N.W.2d 434, 440

(Iowa 2016). But it also recognized that our unpublished cases have used the phrase "better care" when applying the *Melchiori* standard. *See, e.g.*, *In re Marriage of Rosonke*, No. 18-1468, 2019 WL 2871211, at *2 (Iowa Ct. App. July 3, 2019). The district court decided Micheal should have physical care of A.J.L. under either test.

We acknowledge the confusion caused by suggesting a difference between "superior" and "better" care when the terms are synonymous. So we now clarify the significance of *Melchiori*. It is not about some semantic separation between superior and better. Instead, *Melchiori* holds that when the parents share physical care and one petitions for sole physical care—after proving a substantial change in circumstances—that petitioning parent's burden is not as heavy as a parent who seeks to wrest sole physical care from the other parent. 644 N.W.2d at 368. In other words, neither parent is at a disadvantage when asking to modify joint physical care to sole physical care. *See id.*; *see also Harris*, 877 N.W.2d at 444.

Turning to the substance of the district court's decision, we consider the factors in Iowa Code section 598.41(3) (2020).[5] *In re Marriage of Hansen*, 733

---

[5] This non-exhaustive list includes:

    a. Whether each parent would be a suitable custodian for the child.

    b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

    c. Whether the parents can communicate with each other regarding the child's needs.

    d. Whether both parents have actively cared for the child before and since the separation.

    e. Whether each parent can support the other parent's relationship with the child.

N.W.2d 683, 696 (Iowa 2007) (finding these custody factors relevant to physical care decisions). We don't resolve physical care challenges based on "perceived fairness to the spouses, but primarily upon what is best for the child." *Id.* at 698. "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.*

Kristy argues the district court erred in finding Micheal proved he was more prepared to meet A.J.L.'s needs, which include significant and complex mental-health diagnoses. Kristy contends she offers greater stability and has been more attuned to A.J.L.'s challenges. Kristy insists continuity of care is the most important factor for her daughter, and the district court did not give it sufficient weight.

True, in awarding physical care, stability and continuity of caregiving are key considerations. *Id.* at 696. And "the successful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality." *Id.* at 697. But Kristy's efforts to maintain doctor visits, therapy schedules, and daily routines for A.J.L., though well-intentioned, have fallen short of "successful caregiving." A.J.L. continues to struggle with regulating her behavior, especially at Kristy's home.

---

f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.

g. Whether one or both of the parents agree or are opposed to joint custody.

h. The geographic proximity of the parents.

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

Kristy criticizes Micheal for his decisions to move farther away from their hometown, leaving her as A.J.L.'s de facto primary caregiver. As a result, Kristy rarely misses A.J.L.'s appointments, while Micheal often participates by telephone. She also argues granting Micheal physical care creates greater instability because A.J.L. will have to change providers and schools. To counter, Micheal asserts he is aware of therapy services in his area and will follow up with the Iowa City psychiatrist who evaluated her. He also testified that he researched the local school district and knows it is equipped to administer her IEP.

In determining that A.J.L. would do better in Micheal's home, the court focused on Micheal reporting fewer concerns about A.J.L.'s conduct while she was in his care.[6] The court noted that during the summers, A.J.L. "live[s] primarily at Micheal's home for months at a time . . . without any notable or significant problems." The court also considered that A.J.L.'s behavior at school is better than at Kristy's home. Kristy insists that she experiences most of the outbursts because A.J.L. vents the school day pressures at Kristy's house:

> All of her frustrations from school that day get let out at home. I am her safe place. Doctors have told me that. Every frustration she has throughout the day she will come home and let out on me. If it is a frustration, if it is happy, if it is whatever, it gets let out in my house.

According to Kristy: "The fact that there are more behaviors at Kristy's house does not mean she is inferior at providing care. . . . A lack of outbursts at Micheal's

---

[6] Indeed, the record shows a stark contrast between what Kristy and service providers saw at her home and how Micheal describes A.J.L.'s conduct in his care. Kristy contends Micheal tended to minimize their daughter's difficulties. But the district court found Micheal's testimony to be credible "throughout the trial." We defer to that assessment because we did not see the testimony firsthand. *Thorpe*, 949 N.W.2d at 5.

house is not indicative of a superior ability to care for A.J.L. but is rather a result of different outside influences." While we give Kristy's explanation careful consideration, it does not explain why A.J.L.'s teachers do not see the same violent flare-ups at school if school is the source of her frustrations.

Meanwhile, A.J.L.'s therapist, Rebecca Nosbusch, expressed concern about Micheal's parenting style. A.J.L. told Nosbusch that "she is a 'princess' at dad's house" and he "lets me do whatever I want." That observation worried Nosbusch "because a child of her age with this diagnosis need[s] clear, consistent rules throughout the multiple settings they experience." In the same vein, psychologists who saw A.J.L. noted that Micheal "does not have as many problems with [A.J.L.] as Kristy does due to not being as strict."

But Dr. Cochran's progress notes reflected that A.J.L. pushed limits more at Kristy's house because Kristy "struggled with setting limits." The doctor recognized that A.J.L.'s behavior was better at Micheal's house because his "parenting appears to be more consistent, but it is also true that she spends less time there which helps as well."

In response, Micheal asserts Kristy is overwhelmed and unable to handle A.J.L. He criticizes Kristy for her use of restraints and for contacting police for help in controlling their daughter. He points out the district court found it "troubling" that Kristy preferred institutionalizing A.J.L. over letting Micheal have physical care.

But A.J.L.'s therapist believed that Kristy had "done a good job of using any tools and resources" available to her. And it is hard to fault Kristy for following the advice of medical experts and trained professionals. Yet parents must also

exercise independent judgment. And we still face the fact that A.J.L.'s escalating behaviors are more prevalent when in Kristy's care.

One thing is clear, both Kristy and Micheal love their child and want what is best for her. They take different approaches, with Kristy leaning on professional recommendations. Normally, we would find that reasonable. But it does not seem to be working for A.J.L. Despite Kristy's efforts, A.J.L. has habitually acted out in her home. And we recall that custody decisions cannot be based on perceived fairness to the parents, but on what is in the child's best interests. *Hansen*, 733 N.W.2d at 698. Kristy and Josh have struggled to manage A.J.L.'s behaviors for years and are understandably frustrated. In a text message to Kristy, Ms. Koenck relayed A.J.L.'s statements that she wants to go live with her dad and that "she is tired of being yelled at by her stepdad and being blamed for everything."

In the end, we agree with the district court that Micheal has shown a superior ability to minister to A.J.L.'s special needs.[7] Micheal testified to the regular routine he provides for A.J.L., and his plans to continue her mental-health treatment and education. Living with Kristy has meant emergency room visits, law enforcement calls, and physical restraints forceful enough to leave injuries. Those circumstances are not conducive to bringing A.J.L., who is only ten years old, to physical and mental health and social maturity. *See id.* So we affirm the district court's award of physical care to Micheal and the related child support and visitation provisions.

---

[7] Maintaining relationships with siblings is an important factor in determining physical care. *In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974) ("[S]iblings should usually not be separated."). But since A.J.L. has good relationships with half-siblings in both homes, this factor does not tip the balance.

**B.  Attorney Fees**

Kristy next contends that in declining to award trial attorney fees, the district court ignored that Micheal earns $10,000 more each year than she does.  An attorney-fee award must account for the parties' respective needs and abilities to pay.  *In re Marriage of Lattig*, 318 N.W.2d 811, 817 (Iowa Ct. App. 1982).  We afford wide discretion to the district court.  *In re Marriage of Schettler*, 455 N.W.2d 686, 689 (Iowa Ct. App. 1990).  That court was aware of the disparity in the parties' salaries.  But it refused to award Kristy any fees because she was not the prevailing party.  *See* Iowa Code § 598.36 (2021) (providing court *may* award attorney fees to prevailing party in a reasonable amount); *In re Marriage of Maher*, 596 N.W.2d 561, 568 (Iowa 1999).  That refusal was not an abuse of discretion, and we affirm.

Finally, both Kristy and Micheal ask for appellate attorney fees.  That award is not a matter of right but rests within our discretion.  *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997).  In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request must defend the decision.  *See id.*  Given Micheal's higher salary, we conclude he can pay his own appellate attorney fees.  And again, because Kristy has not prevailed on appeal, we decline to award her fees.  But we do assess court costs to Kristy as the unsuccessful appellant.

**AFFIRMED.**